THE TRUSTEES of the Illinois and Michigan Canal, Appellants, *v.* DANIEL BRAINARD, Appellee.

APPEAL FROM THE COOK COUNTY COURT OF COMMON PLEAS.

The Canal Trustees have all the powers in relation to laying out towns upon canal lands that was conferred upon the Board of Commissioners.

Purchasers of canal lands, whether by pre-emption or at public sales can only purchase in lots and legal subdivisions.

The Trustees are authorized to sell lands in such legal subdivisions as they may think

best, in quarter, quarter sections, or otherwise, and the right of pre-emption is limited to the lands on which the improvements are made.

The pre-emptor cannot purchase, until the trustees are authorized to sell, and if it is made their duty to subdivide the lands into town lots and cause them to be appraised, the pre-emptor can only purchase such lots as embrace his improvements.

Whether the party claiming a pre emption entered as a trespasser, or under license, he is equally entitled to the benefit of the law.

The right to pre-emption, is not restricted to the person who was the *owner*, at the tine the improvement was made, but to the person who was the *owner*, when the land was brought into market.

Brainard filed his bill in the Cook County Court, setting forth that in October, 1841, one James H. Scott obtained from the agent of the canal lands a permit or right to occupy the north-west quarter of section twenty-one, in township thirty-nine, north range fourteen, east of the third principal meridian, at which time he executed a bond to the State, in the penalty of one thousand dollars, conditioned as the law directs. That in pursuance of this permit, Scott entered upon the land in 1842, with the intention of making a farm of the whole quarter section, and purchasing it whenever it should be offered for sale, that he broke up, fenced, and raised a crop upon about twenty acres of the quarter section, and from that time until the autumn of 1846, Scott was the sole occupant, in his own person, of the quarter section, that in that autumn Scott's house was burnt. That soon after, Scott built another house, which was continued to be occupied by a tenant, the premises being used solely and exclusively for farming purposes. Scott built a barn upon the premises, and dug two wells, one well was on the east and the other on the west half of the two eighties of the quarter section. This was canal land. The bill refers to the laws of the General Assembly, passed in relation to canal lands, referred to in the opinion. That Scott, in 1846, filed a petition with the Board of Trustees, claiming a pre-emption and the right to purchase the land at the appraisal, and made proof in support of the petition. That in August, 1848, Scott sold and transferred to Brainard. Sets forth the offer to pay $7,167 61½, being the one-fourth part of the appraisal and the interest on the balance, and his three notes of hand, as is required by law for the payment of canal lands. That the tender was waived, and the sale of the land refused by the Canal Trustees.

The prayer of the bill was for an injunction, restraining the Canal Trustees from selling the land to any other person, and that the land should be sold to Brainard at its appraised value.

Trustees v. Brainard.

The answer of the Trustees, states that they have no personal knowledge of the permit to Scott. Denies that any improvements were made by Scott, previous to 1st December, 1842, upon the land, except by ploughing and fencing, and raising a crop upon about twenty acres, on the north-east corner of the quarter section.

That the other improvements, as they are informed, were made subsequent to 1st December, 1842, and will not aid in procuring a pre-emption. That Scott had not resided on the land up to, or in the month of March, 1843. That the land before, and at the time, and ever since, Scott made improvements upon it, was within the limits of the City of Chicago, and that the land is valuable for city lots. That if Brainard is entitled to a pre-emption, he is only entitled to the twenty acres first improved. That the quarter section has been laid off into lots under authority of law. That the quarter section was appraised by lots. That they are bound to sell in lots. That they offered to sell lots 57 and 58, at the appraised value to Brainard. That the lots would bring much more at public sale, than they were appraised at.

Proofs were taken, and the cause was heard by Spring, Judge of the Cook County Circuit Court, who entered a decree in favor of Brainard, the complainant, at February term, 1851. The Canal Trustees appealed from this decision.

The proofs taken sustained the allegations of the bill.

I. N. ARNOLD, for Appellant.

The statute of 21st of February, 1843, and amendments of the 4th of March, 1843, are to be construed together. No rights had accrued under the first, until long after the second had been passed.

Rule of construction: They are to be regarded and construed as public grants (as they virtually are). The rule is, "Public grants should have a construction most favorable to the grantor; for being made by a trustee, for the public, no alienation should be presumed that is not clearly expressed." 5 U. S. Dig., 87, sec. 17; Hagan v. Campbell, 8 Porter, 9. This rule ought to be rigidly applied to this fund. The state was its trustee by the government of the United States, and as such should guard it from *spoliation.*

33

What is the construction of the act? If one can be found which is *fair* and *just* towards *settler,* and will give him all that in equity and good conscience he is entitled to, will the Court torture the language and do violence to the intention of the Legislature, by lending itself to these claimants? The true construction is, to give to the claimant *the smallest legal subdivision,* or so many of them, as will embrace his entire improvements. Surely this is *fair* and *just.* The application of Skinner as trustee, was to purchase s. e. $\frac{1}{4}$ of sec. 21, t. 39, &c. Trustees decided to allow blocks 3 and 16, and refused the remainder.

There are two classes of *legal subdivisions.* 1st, The subdivision into *farming lands;* 2d, Into town and city lots. The lands were transferred to the state by the United States in the subdivision of sections, and had been surveyed in the usual manner of the government surveys. A legal subdivision is such a one as is recognized in the law, and is usual. Under the practice of the land office of the United States, the smallest legal subdivision of farming lands is forty acres. The government sells by this division, and it is a matter of general notoriety that it is regarded as an ordinary legal subdivision. *Vide* U. S. Statutes. This subdivision requires no additional survey to designate and describe it. But this subdivision has been repeatedly and expressly recognized by the laws of this state. This as early as 1829. See Canal Laws, p. 9, sec. 7.

Commissioners authorized to sell in such divisions. Canal Laws, p. 13, sec. 7, 1831: "Such Commissioners may cause such tracts of land as they think proper, to be sold in tracts of *forty acres,"* &c. This does not require them to *subdivide,* but *authorizes to sell;* and if it were not so before, makes a forty acre tract a legal subdivision. And yet, in the face of this, the Court below gives appellees 160 acres, on the ground that that was the smallest legal subdivision. See Canal Laws, p. 28, sec. 1, expressly recognizing 40 acre tracts, by state and United States, as legal subdivisions.

What is the authority of the Canal Trustees, and what was that of the Commissioners, in regard to town lots? Canal Laws, p. 20, sec. 32: "The Commissioners shall examine the whole canal route, and select such places thereon as may be eligible for town sites, and cause the same to be laid off into town lots; *and they shall cause the canal lands in and near Chicago to be laid off into town lots."* Act of January 9, 1836.

In pursuance of this act, in January, 1837, the Commissioners laid off the premises in question into town lots, and caused it to be surveyed, subdivided, and marked the same by *stones and stakes,* and a plat thereof was made, &c. *Had Commissioners authority to do this? Clearly they had, by the above act.* Did these acts amount to a compliance with the statutes? *It was analogous* to cases where United States officers were authorized to reserve for military posts, lighthouses, &c. Such reservations never were the subject of pre-emption rights. *See Beaubien case;* Jackson *v.* Wilcox, 13 Peters; same, 1 Scam., 357. But the law itself amounts to a reservation, and designates that the lands *"in and near Chicago should be reserved, and laid off into town lots."* Is it not incredible, that individuals should attempt to defeat this by claims to *farms* of 160 acres, made up of these *town lots, so appropriated by law?* This section had been appropriated, and *Scott knew it at the time he went on to it.* He knew it, because this act was a public law. *The premises were in the city of Chicago,* and so appropriated. City was incorporated as a town in 1835, and as a city in 1837. He knew it in point of fact, as was proved.

See also Canal Laws, p. 25, sec. 7. This was an appropriation by law, whether actually executed by laying off or not. 1 Scam. R., 381. Occupants went on and made improvements subject to this act, and could acquire rights to town lots only.

Board of Trustees have the same powers as the Board of Commissioners. Canal Laws, p. 43, sec. 8. *Laws on subject of subdivision:* Canal Laws, p. 10, sec. 7; same, p. 13, sec. 7; same, p. 20, sec. 32; same, p. 25–6, sec. 7; same, p. 28, sec. 1. These powers are conferred upon the Trustees. Canal Laws, p. 42, sec. 8.

These lands and lots must be sold in *lots and legal subdivisions.* The power to subdivide was a continuing power, even if it had not been executed. The person making improvements does so, subject to the power of the Trustees to subdivide. The right to purchase lands suitable for town lots at an appraisal, is subject to this power of subdividing.

*What* is it the party obtains the right to purchase, at the appraisal? *Answer,* "The land or lot on which the improvement is situated." If in the country, the right is to purchase *the land.* If in the city, the right is to purchase *the lot. When* does this right become absolute? At the time when *lands or lots* are to be sold. This right, then, is the right to purchase, at the appraisal,

*and when lands or lots are offered for sale, the land, or the lot,* WHEN OFFERED FOR SALE, on which the improvement is situated. The "owner" shall have the right to purchase—owner *when?* of course *at time of sale;* otherwise, complainants' no right to purchase at all. They were not the owners until 1848.

They who contend for appellees must hold, that by an improvement on any part of a legal subdivision, when the person making it acquires a right to that whole subdivision; so that, if then it had only been surveyed into *townships or sections,* the person would have acquired a right to the whole *township* (by settling on half an acre) or section, as the case may be!! Why not as well, as a whole quarter section?

It follows from this position, that the party by settling on half an acre, could nullify and repeal the power to subdivide. The true solution and construction is: the party has a right to purchase the lands or *lots,* according to subdivision, *existing at the time of sale,* on which his improvements are situated. This construction avoids the absurdities of the other, and does full and complete justice.

Does any man pretend, that the legislature, when it gave this right of purchase, intended to authorize a party, by settling on half an acre in a city, to take 160 acres, and deprive the Trustees of power of dividing it into city lots? Suppose the law had read: "The owner of such improvements shall be entitled to purchase the lands or lots on which said improvements are situated, at an appraisement, &c. *But said Trustees may sell the same in forty-acre tracts, or they may subdivide into smaller quantities and sell the same, as they may think most profitable to the Canal fund.*" Or had it read: "The owner may purchase the land or lot, &c., at an appraisal. 'But the Trustees *shall* cause the canal lands *in* or *near* Chicago, suitable therefor, to be laid off into town lots.'" Or had it read: The owner, &c., subject to the power in the Trustees "to cause surveys of such town sites as they may select," to be laid out, &c. If these sections had been thus brought into juxtaposition, nobody would ever have denied the right to subdivide into town lots, and the party should take so many as his improvements were situated upon.

But all these provisions are the law, binding upon these parties; and the appellees, as settlers, went on subject to them. The *Trustees* took the lands with the power—nay, the *obligation* im-

posed upon them—to subdivide into *city lots.* The *settler* went on with the knowledge *that Trustees must* subdivide. He expected to get so many lots as his improvements covered, and no more. If Trustees had failed to subdivide under these laws, and had allowed a man to take 40, 80, or 160 acres in this growing city, they must have deserved severe censure.

Can all these acts be repealed by implication? Can a man, by going on a lot 80 by 100 feet, stop the progress of improvement, and prevent its being laid out into city lots and improved? Lands enhanced within city limits are not subject to pre-emption or purchase for farming purposes; so it has always been held under laws of United States. Land Laws, p. 160, 161, &c. Opinion of *Wirt, Attorney General.*

The laying out of this quarter section is either *legal or illegal. If legal, decree must be reversed;* because it would follow, that it must be sold and appraised according to such subdivision. "Lands and lots shall be offered for sale in lots and legal subdivisions." If it be sold in *city lots, appellees* are clearly entitled only to such of them as their improvements are upon. But they applied to purchase, as a *quarter section.* Their offer to tender was *as such; they ask a decree for it as such.* They never applied for the *lots,* they never offered to tender money for *lots,* and they do not ask to purchase as such. There has never been any refusal to sell it in lots and blocks. If this plat is legal, Trustees must sell in lots and blocks; and then comes in the law: "The owner of the improvements shall have the right to purchase the lots"—what lots? The lots then about to be sold, "on which they are situated, &c., at an appraisal." This right was granted by Trustees, by allowing a part of the blocks.

Application was made for tender, &c., and prayer of bill is for quarter section. To grant this, requires the plat *to be vacated.* This could not be done without making the city a party. The *fee* of the streets has, by recording plats, been vested in the city. Canal Trustees *v.* Haven, 11 Ill. R. *If the subdivision is illegal,* the appraisal is illegal and void. *It has been appraised in separate lots and blocks.* If the subdivision is illegal, it must be vacated. Court cannot do this, because it has not the proper parties. *If vacated, the appraisal is void.*

*Again.* The Court cannot give him the right to purchase a quarter section by virtue of improvements made on two blocks

into which it is divided, and decree it to be sold in *lots and blocks.* It must be sold as a quarter section. To decree its sale in lots and blocks, and allow him to purchase as a quarter section, would be an *inconsistency* and an *absurdity.*

*The decree is therefore a felo de se.* It grants the right to purchase the *whole quarter section,* and then *directs the sale in blocks.* The basis of the decree is that the Trustees could not legally subdivide, and then legalizes their subdivision. This part of the decree legalizing the subdivision, is erroneous. Because it is inconsistent with the prayer of the bill, and is a fact not alleged in the bill, and not in issue by the pleadings. 5 Gilman's R., 503. "Relief inconsistent with the specific relief prayed for, will never be granted under a general prayer." 18 John. R., 562. Complainants must recover, if at all, on the allegations of their bill. 11 Ill. R., 660; McKay *v.* Bissett, 5 Gilman, 503; 10 Wheaton, 181. Here the allegation was: That the complainants applied to purchase quarter section, and offered to tender, &c., for quarter section. *Not to buy as blocks, &c.* If complainants were entitled to purchase 160, 80, or 40 acres on the case presented in the bill, then the appraisal is void, and there must *be a re-appraisement.* Same directs sale, *in legal subdivision;* and sale must not be for less than appraisal; consequently it must be appraised as sold: otherwise you would have to split up arbitrarily the appraisal. If complainants are entitled to purchase, there *must be a re-appraisal.*

R. S. BLACKWELL, for the Appellants.

The merits of the controversy in this case depend upon the construction of the proviso to the thirteenth section of the act of February 21, 1843, which is in these words: "*Provided,* That in all cases where improvements were made upon the said canal lands or lots, previous to the first day of February, 1843, the owner of such improvements shall be entitled to purchase the said lands or lots, on which said improvements are situated, at an appraisement, to be made as aforesaid, without reference to said improvements:" and the second section of the act of March 4, 1843, limiting the operation of the said proviso, to improvements made prior to December 1, 1842.

In 1842, Stuart, under whom the appellees claim their rights, entered upon, and improved a part of the E. frac. of the S. E.

frac. qr. sec. 21, T. 39 N., R. 14 E. of the 4th principal meridian. This parcel of land then lay within the corporate limits of the city of Chicago, and was laid out into town lots by the Canal Commissioners, on January 2, 1837. A new survey and plat was made by the present Board of Trustees, August 31, 1848, and duly recorded; by which plat it appears, that out-lots 3 and 16 included within their metes and bounds, all of the improvements made by Stuart prior to December 1, 1842.

The appellees insist that they are entitled to a pre-emption, or right to purchase at the appraised value, the whole frac. qr. upon which these improvements are situated, regardless of the subdivision into lots and blocks.

This construction is at war with the *letter* and *spirit* of the canal laws, and against the *policy* of our entire system of legislation upon this subject. The language of the law is imperative, that the Canal Commissioners *shall* lay out towns upon all eligible sites, and make additions to such towns as may have been already laid out upon the canal lands. Canal Acts, 10, §7; 13, §7; 14, §12; 20, §33.

And by a *special* provision, the canal lands, lying in and near the city of Chicago, are directed to be laid out by the Commissioners, into town lots. *Ibid.*, 20, §32; 25, §6.

The parcel of land in controversy, is declared by law to be included within the corporate limits of the city. Laws 1836–7, p. 50, §1.

The present Board of Trustees possess the same *powers*, and are required to perform the same duties conferred and enjoined upon the Canal Commissioners by the act of January 9, 1836, and the acts amendatory thereto. Laws 1842–3, p. 55–6, §8.

The *spirit* of the law is clearly manifested by these provisions. Canal Acts, 9, §7; 28, §1; 40, §2; 45, §13.

The policy of the laws, as collected from our entire system of legislation upon the subject, is equally clear.

These lands were granted by the U. S. to Illinois, to aid in the completion of the canal, and for no other purpose. Canal Acts, 3 and 4, §1, 3. The canal has ever been regarded as a work of national importance, connecting the Lakes and Gulf of Mexico. The donation was in the nature of a trust for this purpose, with a reversion in the federal government. Therefore, all legislation tending to diminish or destroy this trust fund,

ought to be strictly construed. And the presumption is that the legislature never intended her bounty to actual settlers to be construed into an invitation to speculate in canal lands. No encouragement has ever been given to settlers upon these lands, Canal Act, 21, §34, and numerous laws have been passed from time to time, prohibiting, under severe penalties, trespasses and intrusions of every kind upon the canal lands. Laws 1836-7, p. 44. When permits have been granted, stringent conditions have been annexed to them. Laws 1836-7, p. 45. So of sales upon a credit. Laws 1838-9, p. 177, §2. Sales limited in quantity to 3 town lots, or a ½ section of farming lands. Canal Acts, 36, §14; 37, §20. Canal Commissioners prohibited from selling any two quarter sections adjoining each other. Special Session Laws 1837, p. 11, §2. Speculation by agents of the State forbidden under severe penalties. Canal Acts, 22, §39; 24, §9. So of combinations to procure canal lands at low prices. Canal Acts, 22, §40.

The legislature have always looked to the *increase* in the value of canal lands, as a means of meeting the expenses attendant upon the construction of the canal. Canal Acts, 25, §8; 28, §2; 29, §5; 31, §4.

The *termini* of the canal were always looked to by the legislature with a jealous eye, and speculation guarded against. Canal Acts, 23, §44; Laws 1831, p. 54-6, §1, 10, 11; Laws 1836-7, p. 64, §38.

These various provisions of the canal laws establish the fact conclusively, that the policy of our legislation has ever been to prevent trespasses upon the canal lands, to guard against speculations of all kinds in canal property, and increase the canal fund as much as possible.

When Stuart located upon the parcel of land in controversy, there was no law in force allowing, or even squinting towards a pre-emption, and to say that he entered with a view to the purchase of the *whole* tract is absurd. He was a trespasser at the time. If he can be regarded as a disseizor of the State, his disseizin must be confined to his actual enclosure and improvements. But there is no such thing as a disseizin of a sovereign State.

This law was designed to give to the *bona fide* settler upon canal lands, the benefit of his improvements, by permitting him

to purchase at the *appraised* value, without compelling him to run the gauntlet at a public sale. Without this law, his improvements would have become vested in the State, because he made them at his peril, with a full knowledge of the law. A construction which gives to the settler such a legal subdivision of the land, as may be covered by his improvements, is all that he can demand. The general principles of the law warrant this construction. The proviso operates as a grant, and is to be construed most favorably for the State, as in all other public grants.

Again, the State is the beneficial owner of these lands. Canal Acts, 41, preamble and §1; 50, §1; 46, §14, 16; 45, §14; 47, §19; People *v.* Nichols, 4 Gil., 307. She has conveyed them to the appellants in trust. The great object of this trust, on the part of the State, was to secure the speedy completion of the canal, and on the part of the Trustees, to secure for the bond-holders the debt due them by the State. Canal Acts, 41, §1 and preamble. And for the purpose of enabling the Trustees to perform their trusts, the statute provides for the liberal construction of the act in our Courts, and to supply by future legislation all defects in the law. Canal Acts, 47, §20.

Under such circumstances, *good faith* requires that a *latitudinarian* construction should not be placed upon this proviso, by which speculation in this trust fund is encouraged, and the fund consequently decreased. The *proviso* operates as an *exception* to the grant of the canal lands to the Trustees, and must be construed most favorably to the grantees.

Again, this right of pre-emption was intended as a bounty to settlers upon canal lands. This bounty, it cannot be supposed, was designed to be extended, to the sacrifice of *great public interests*. Wilcox *v.* Jackson, 13 Peters, 514; People *v.* Canal Commissioners, 3 Scam., 160.

Lastly. A literal interpretation is not always to be adhered to, the words of a statute may be enlarged or restrained to effect the intent of the legislature. Mason *v.* Rogers, 4 Litt., 375; Dwarris, 728. Upon this principle, the attorney general, and Courts of the United States, have, by construction, restrained the operation of the pre-emption laws of the U. S., in cases analogous to the one at bar. 2 Land Laws U. S., 45, 161, 1023–4; Clestard *v.* Pope, 12 Wheat., 586; 6 Peters' Cond. R., 654; Reynolds *v.* McArthur, 2 Peters, 426; Freytag *v.* Powell, 1 Wharton, 536.

The conclusion is inevitable, that the proviso is restrained by the power of the Canal Trustees to lay off the land in controversy, into town lots, that Stuart acquired no rights until this power was exercised in 1848, and then the appellees, claiming under Stuart, became entitled to a pre-emption to out-lots 3 and 16, being all of the tract in controversy covered by their improvements.

Thus far, upon the assumption that the land was never laid out into town lots. We now insist that there was a subdivision and plat of this land, made by the Canal Commissioners, in 1837, which is valid, though not recorded until 1848, by which it was appropriated and set apart as city lots, by the authority of the State. The law requiring a record of the plat was directory only. Taylor *v.* Brown, 2 U. S. Cond. R., 235; 5 Cra., 234; Dwarris' Stat., 715–16. No time was fixed within which the plat should be recorded. The record of it in 1848 is a compliance with the law. Hoge *v.* Currin, 3 Gratt., 201; Williams *v.* Lumenberg, 21 Pick., 82.

If the object of the law was to give notice, then the law is complied with in this case. The proceedings of the Canal Board were required by law to be recorded. To these records Stuart had a right of access and inspection. Canal Acts, 17, §11; 20, §26; 23, §42–3.

Bailey's Map of Chicago was then notorious, on which this Addition to Chicago could be seen. The monuments upon the land were open and visible. They were pointed out to Stuart by Wilder. And the land lay within the limits of Chicago. These facts are sufficient to charge Stuart with notice of the survey and plat.

Again, Stuart was a trespasser, and not entitled to notice. 8 S. & M., 268. Besides this, recording laws are made for the protection of purchasers from the same grantor, and have nothing to do with the extent of a grant between the grantor and grantee. This law is not like the general recording laws of the State, it does not say that recording shall be notice, nor does it declare the plat void against subsequent purchasers unless recorded within a limited time. The rule is that the record is not notice unless declared so by law. Baker *v.* Washington, 5 Stew. & Por., 142; Tatum *v.* Young, 1 Porter, 298.

Again, the survey and plat binds the State, like an unrecorded

deed. Strong *v.* Darling, 9 Ohio, 201. And amounts to a dedication of the streets to the public. Morris *v.* Bowers, Wright, 749. And no subsequent disposition of the property by the State can affect the rights of the public in the streets thus dedicated. 18 Ohio, 250. User of the streets not necessary to render the dedication valid. Rowan *v.* Portland, 8 B. Mon., 250.

The city of Chicago being interested to the extent of her interest in the streets, ought to have been made a party to this suit. Dummer *v.* Deer, 1 Spencer, 86; Watertown *v.* Cowen, 4 Paige, 510.

The pre-emption right in this case is not assignable, it is contrary to the rules of the common law, and against the policy of our statute, which was intended as a bounty for the actual settler.

N. H. PURPLE, for Appellants.

S. A. DOUGLAS and JUDD & WILSON, for Appellees.

TRUMBULL, J.     The appellee, who was complainant in the Court below, claims the right, as the assignee of the original settler, to purchase at the appraisement, a quarter section of canal land, situate within the corporate limits of the City of Chicago. His right to make the purchase depends upon a proper construction of the legislation of this State, in reference to the Illinois and Michigan Canal, and the lands granted to the State, to aid in its construction. The grant of land equal to one half of five sec.ions in width, on each side of the canal, was made by act of Congress, of March 2, 1827. In 1829, the State of Illinois created " The Board of Commissioners of the Illinois and Michigan Canal," and took steps for the construction of the work, which was prosecuted by the State. at an expense of several millions of dollars, till February 21, 1843, when, the work still being in an unfinished condition, an act was passed for the purpose of procuring a fund for its completion, whereby the canal and canal lands were placed in the hands of trustees.

Between the time when the Board of Commissioners of the Illinois and Michigan Canal was established, and 1843, various acts were passed in reference to the canal lands and the sale of the same, some of which it becomes necessary to notice.

The act of January 22, 1829, made it the duty of the Commis-

sioners to give notice, and sell the canal land, in half quarter sections, quarter or fractional sections, and also gave them authority to lay off into town lots, such parts of said lands, as they might think proper, and to sell the same.

The seventh section of the act of February 15, 1831, authorized the commissioners to sell canal lands in tracts of forty acres, or to subdivide and sell them in smaller quantities, as they might deem most profitable to the canal fund.

The thirty-second section of the act of January 9, 1836, is as follows: "The commissioners shall examine the whole canal route, and select such places thereon as may be eligible for town sites, and cause the same to be laid off into town lots, *and they shall cause the canal lands, in or near Chicago, suitable therefor, to be laid off into town lots.*" Sections thirty-three and four of the same act authorize the sale of lots, and annexed to the thirty-fourth section is this provision: "Provided, that all persons who may have made improvements upon any of the lots authorized to be sold, shall be permitted to remove such improvement, at any time before the day fixed for the sale of any such improved lots, being responsible for all unnecessary damage done or suffered by said removal."

Section seven, of the act of March 2, 1837, provides for laying out towns, and for certifying and recording town plats.

Section one, of the act of July 21, 1837, authorizes Commissioners to subdivide and sell a portion of the canal lands in tracts of not less than forty, nor more than eighty acres.

The act of March 4, 1837, provides for giving permits to all persons residing upon, or cultivating canal lands, to remain upon or to continue to cultivate the same, upon certain conditions; one of which is, that the occupant shall surrender the possession of the lands described in the permit, to the agent of the State, together with all improvements thereon, whenever said lands shall be advertised for sale.

The act of February 26, 1839, imposes penalties upon such persons as occupy or cultivate canal lands, except under permits, after receiving notice, which the agents of the State are required to give. This, and the preceding act, also impose penalties for trespassers upon canal lands.

The second section of the act of February 1, 1840, requires

the Commissioners, in the sale of timber land, to divide it into small lots, not to exceed forty acres in one lot.

It is manifest from the foregoing acts of the legislature, that the Commissioners of the Illinois and Michigan Canal, were authorized in their discretion, to lay out town lots and make sale of town lots, or to subdivide and sell canal lands in tracts of forty acres or less; and it was made their duty, by the act of 1836, to cause the lands, in or near Chicago, suitable therefor, to be laid off into town lots. Thus the law stood at the time of the passage of the act of February 21, 1843, providing for placing the canal and canal lands in the hands of trustees. The eighth section of that act declares, that, "The said Board of Trustees of the Illinois and Michigan Canal, when duly appointed and elected as aforesaid, shall apportion their respective duties among themselves, and so far as is not incompatible with this act, *shall possess all the powers and perform all the duties conferred upon the Board of Commissioners of the Illinois and Michigan Canal,* by the act entitled, ' An act for the construction of the Illinois and Michigan Canal,' approved January ninth, eighteen hundred and thirty-six, and the acts supplementary and amendatory thereto."

It is provided by the thirtieth section of the same act, that, "none of the lots, lands or water powers, so granted to the said Trustees, shall be sold, until three months after the completion of said canal; the said lots, lands and water powers shall then be offered for sale by the said Trustees at public auction, *in lots and legal subdivisions* once or oftener in each year for the four successive years, said sales to be made for cash, or on a credit in the manner prescribed in the act of the ninth of January, eighteen hundred and thirty-six The said lands, lots and water power, before they are offered for sale, as aforesaid, shall be appraised by three disinterested persons, to be appointed by the judge of the Circuit Court, in which said lands, lots, and water power are situated, who shall take an oath, faithfully and impartially, to discharge the duty of appraisers. Said lands, lots, and water power, when so appraised, shall not be sold for less than the appraisement."

Annexed to said section, is the following proviso: " *That in all cases where improvements were made upon the said canal lands, or lots, previous to the first day of February, eighteen hundred and forty-three, the owner of such improvements shall be entitled to pur-*

*chase the said lands or lots, in which said improvements are situated, at an appraisement to be made, as aforesaid, without reference to said improvements."* A subsequent act, passed March 4, 1843, limits the foregoing proviso, to improvements made previous to the first day of December, 1842.

The record shows, that one James H. Scott, previous to December, eighteen hundred and forty-two, made an improvement upon the land in controversy, the N. W. qr. sec. 21, T. 39, N. R. 14, E. of third P. M., by enclosing and cultivating some twenty acres, situated in the north-east quarter of said quarter section; that the complainant, at the time of filing his bill, was the owner of said improvement; that the defendants, on the thirty-first day of August, eighteen hundred and forty-eight, caused said quarter section, (the same being canal land, and situate within the corporate limits of the City of Chicago, as the same are defined by the act of March 4, 1837, incorporating said city;) to be subdivided into lots and blocks, and a plat thereof to be made, which was duly certified, acknowledged, and filed for record, on the 31st of August, 1848; that the canal was completed in May, 1848, and that the defendants, after having caused said quarter section to be appraised, according to the subdivision thereof, had advertised the same for sale, when the complainant offered to tender the money, and do all the acts necessary to complete his purchase, to the entire quarter section at the appraisement; which defendants, waiving the tender, would not allow; but admitted his right of pre-emption to that part of the quarter section, designated upon their plat, as blocks fifty-seven and fifty-eight, within which were embraced all the improvements made by Scott, prior to December, 1842.

The Trustees, under the act of February, 21, 1843, so far as related to the laying out of towns, possessed all the powers conferred upon the Board of Commissioners of the Illinois and Michigan Canal, by the act of January ninth, eighteen hundred and thirty-six; and the thirty-second section of that act, expressly required the Commissioners to cause the canal lands, in or near Chicago suitable therefor, to be laid off into town lots. The tract of land in question was situate near Chicago at that time, and, as we have already seen, was incorporated into the city, by the act of the fourth of March following. That it was suitable for town lots, there can be no question, and it therefore became

the duty of the Canal Trustees, to lay it out previous to the sale, unless there was something in the act of 1843, to restrain them for so doing. Such the complainant insists was the case; that immediately upon the passage of the law granting the right of pre-emption, Scott became vested with the absolute right to purchase at the appraisement, the entire quarter section, upon which his improvement was situated, and that the Canal Trustees possessed no power after that time, to subdivide it. If the principle contended for be correct, we see no reason for limiting the pre-emption to a quarter section, for with the same propriety it might be extended to a half or even a whole section. It will be observed, that the act allowing the pre-emption, unlike most of the acts of Congress in this respect, does not define its extent. The statute authorizes the owner to purchase the *lands* upon which his improvements are situated, without determining the number of acres. Literally, therefore, he would be confined to the boundaries of his improvements, but such, doubtless, was not the legislative intention. It could never have been the design, in allowing the owner of improvements to purchase the lands on which they were situated, to change or affect in any manner the general system of rectangular surveys, adopted in the subdivision of the public lands. The Trustees were required by the act to sell in *lots and legal subdivisions,* and as a vendee can only purchase in the manner which his vendor is authorized to sell, it follows that purchasers of canal lands, whether by virtue of pre-emptions or at public sales, can only purchase in lots and legal subdivisions. What, then, is a *legal subdivision,* such as the Trustees are authorized to sell? [It has been argued that resort must be had to the legislation and practice of the general government, in reference to the public lands, to determine this question. Grant it, and what follows? The acts of Congress provide for the subdivision of the public lands into half quarter, and quarter quarter sections, and expressly authorize sales to be made in subdivisions of forty and eighty acres. Part 1, Public Lands Laws, &c., 323, 493; *ibid,* Part 2, 561. The argument that nothing is a *legal subdivision,* except what has been run off and marked upon the ground as such, in making the public surveys, proves too much; for if it be sound, then a quarter section is not a legal subdivision, it not being the practice, in surveying the public lands, to run round and mark upon the ground the

boundaries of any subdivisions less than whole sections. Mc-Clintock *v.* Rogers, 11 Illinois, 295.

A forty acre tract, or a quarter quarter section, is a subdivision of land recognized by act of Congress, and is, therefore, just as much a *legal subdivision* as a quarter section, or any other subdivision known to the law. The right of the Trustees to offer the canal lands for sale in quarter quarter, half quarter, or quarter sections, as they shall deem best for the interests of the canal fund, is beyond dispute; and the right of pre-emption, as has been already shown, must be limited to the lands on which the improvements are situated, as the trustees are authorized to bring the same into market. If, therefore, the trustees think proper to offer the canal lands for sale, in tracts of forty acres, and one such subdivision, as in this case, embraces all the improvements put upon the land, prior to December, 1842, the owner thereof, would be confined in his right of pre-emption to the quarter quarter section, embracing his improvements, while, if the lands had been offered for sale in tracts of one hundred and sixty acres, his right of pre-emption would have extended to the whole quarter section. The record, in this case, does not show that the Trustees were offering or about to sell the whole quarter section *together*, and unless such were the fact, the complainant would have no right to purchase the entire quarter, at the appraisement.

The main ground, however, upon which we base our decision is this, that the right of the Trustees to subdivide lands, and lay out town lots, was not intended to be abridged, or in any manner affected, by the proviso to the thirteenth section of the act of February 21, 1843. Although the legislature, by that act, provided for surrendering the canal and canal lands to trustees, yet it was for the express purpose of providing a fund for the completion of the canal, and upon certain conditions, one of which was, that the canal, and the lands remaining unsold, should revert to the State, whenever the canal debt should be paid. It was always the policy of the State, in disposing of the canal lands, to adopt such a course as would be most likely to benefit the canal fund. Hence the authority given to the Commissioners, from time to time, to subdivide the lands and lay out towns as they should consider would best promote the interest of that fund.

This power, as we have already seen, unless repealed by the proviso in favor of the owners of improvements, was continued to the Trustees.

Did the legislature intend by that proviso to repeal it? What claim had the owners of these improvements to legislative favor? None certainly. If the improvements were made under permits, then it was with the express understanding that the possession, together with all improvements, should be surrendered to the State, whenever the lands should be advertised for sale, if made by trespassers in violation of the laws of the State, their owners would be entitled to still less favor. In no point of view, had they any just claims upon the legislature, and the bestowal of the right of pre-emption upon such persons was purely a bounty, which they had no right to expect, and for which they paid no consideration whatever.

The object of the law was, to give to owners the benefit of improvements they had made previous to a certain day. The lands and lots were to be appraised, at what it is to be presumed was their true value, without regard to the improvements, and by taking them at the appraisement, the owner secured the benefit of what he had done upon the land, without being subjected to the competition of a public sale, and this was all that the legislature could have intended to bestow. The granting of this privilege was never designed to deprive the Trustees of the power to lay off the canal lands, within the city of Chicago, into town lots, nor to interfere with the general policy of the State, in reference to the sale of said lands. It is not to be presumed, that the legislature would deprive the canal fund of the benefit to arise from laying off, and selling in town lots, a quarter section of land, lying within the city of Chicago, for the purpose of bestowing a gratuity upon one who had no claim to favor, and that too, at the expense of a fund, which it had ever been the policy of the State to guard with peculiar care. To give such a construction to the act of 1843, would be to allow an incidental matter, a mere gratuity, to control, not only the principal thing had in view, but also the general policy of the law. The permission to purchase lands and lots at the appraisement, was manifestly intended as a *privilege*, to be exercised in subordination to the general law, in reference to the subdivision of lands and bringing them into market.

34

Such has always been the construction put upon acts of Congress granting pre-emptions, by the officers of the general government. The attorney general, upon being consulted as to what effect a pre-emption right. had upon the surveys of the public lands, replied : " I am of opinion, that the survey should be made in conformity to the general system established by law, and by the instructions of the department, without any reference whatever to the existence of a pre-emption law, or to the fact that rights have been claimed and established under it." Public Land Laws, opinions, &c., part 2, 138. In a letter from the treasury department, upon the same subject, it is said : " If the party does not choose to purchase the tract, because the lines do not suit his convenience, he has not the most distant right to complain, since he knew when he made his settlement, that the land would be surveyed into sections, by north and south, and east and west lines, and that nothing was promised to him. The law has now granted to him what the laws of the United States have granted no where else, viz : a preference to purchase either a quarter, half, or entire section, including his improvement ; and the law is represented as impracticable or unjust, because it does not permit the party, to whom that privilege is granted, to select in a particular manner, the land he would prefer, and because it does not set aside, for his sake, the general system of surveying." *Ibid* 694.

This language is peculiarly applicable to the present case. The State of Illinois, by the act of 1843, granted to the owners of improvements on canal lands, what she had never granted before. When Scott made his improvement, he knew that nothing was promised him, and that the quarter section upon which he made it, was within the city of Chicago, and that the law required it should be laid off into town lots, if suitable therefor. He has not, therefore, the least right to complain.

It has been urged as a reason, why the Trustees had not the power to subdivide the land in question into town lots ; that the existence of such a power would place every pre-emptor at the mercy of the Trustees, as by laying out a town, and dedicating the land upon which his improvements were situated, to some public purpose, they would totally destroy his right to purchase. It is a sufficient answer to this argument, to say that the record presents no such case ; and it will be time enough to determine

whether the Trustees can be restrained in the exercise of their powers, when they attempt to abuse them. But the fact that a power may be abused, is no argument to prove its non-existence; if it were, it would not be difficult to prove, that the Trustees have not the power to lay out a town in any instance; for if the power exists, it may be said that it may be abused by dedicating to the public for streets and squares, nine-tenths of all the lands thus laid out, and yet, who ever doubted the power of the Trustees to lay out towns, at suitable points, along the route of the canal.

The act of 1843, did not confer upon Scott a right of pre-emption to a section, a quarter section, or any other definite quantity of land; nor did it give him an immediate right to purchase. He was compelled to wait, till the Canal Trustees should proceed under the law, to have the lands, or such of them as they should think proper, subdivided, appraised, and brought into market.

Keeping in view the fact, that the act of January 9, 1836, requiring the canal lands, in and near Chicago, to be laid off into town lots, if suitable therefor, is as much part of the act of February 21, 1843, as if therein incorporated, and this whole case may be briefly stated thus: The State had undertaken a great public work, and found herself without the immediate means to accomplish it; for the purpose of raising those means and securing an early completion of the work, she surrenders to trustees, a vast amount of lands and other property, upon certain conditions, one of which is, that they will lay off into town lots, the tract of land in question, for it is shown to be in Chicago, and suitable for town lots; another is, that the lands, lots and water powers, surrendered to them, shall, within a certain time, be exposed to public sale, in lots and legal subdivisions; and a third, that the owners of improvements made upon canal lands or lots prior to December 1, 1842, shall have the privilege of purchasing the lands or lots on which they are situated at an appraisement made without reference to such improvements. The term *lands and lots*, by itself, is indefinite, but when viewed in connection with the other conditions of the trust, its meaning is obvious.

The pre-emptor cannot purchase till the trustees are authorized to sell, and before proceeding to sell, it is made their duty to subdivide the land in question, into town lots, and cause them to

be appraised, then, and not before, the pre-emptor has the privi-
lege of purchasing such lots as embrace his improvements, at the
appraisement.   He cannot purchase the entire quarter section,
as land, because the exercise of such a privilege would be incon-
sistent with those conditions of the trust which require it to be
subdivided and sold in lots, and it is the duty of the Court, if
practicable, so to construe the whole law, that all its provisions
may have effect.

In our opinion, the subdivision of the land, in controversy,
made by the Board of Trustees, on the 31st of August, 1848, was
legal, and it follows as a consequence, that the complainant's right
of pre-emption extends only to the lots as they have been laid
out, which embrace the improvements made by Scott, prior to
December, 1842.   The record shows that his right to this extent,
was admitted by the trustees; possibly, therefore, there may be
no absolute necessity for passing upon the other questions pre-
sented by the record, but, as they have been fully argued, and
the whole matter is now before the Court, it may save future
litigation to express an opinion upon some of them, and make a
final disposition of the case.

It is made a question in the case, whether Scott entered upon
the land in question, under the authority of a permit, or as a
trespasser without authority.   In our view, it is immaterial in
which capacity he entered.   The law is sufficiently comprehen-
sive in its terms, to embrace all classes of persons who made
improvements previous to the time limited by the act; and it is
unreasonable to suppose, that the legislature could have intended
to bestow the right of pre-emption upon those who had made
improvements in violation of law, and withhold the same privi-
lege from those whose improvements were made under its sanc-
tion.

It has also been insisted, that the right to purchase at the ap-
praisement, is a personal privilege, of which the owner of the
improvements, at the date of the act, can alone avail himself.
The language of the statute is general, and not confined to the
owner at any particular time; and for the same reason that the
words, " *lands and lots*," have been construed to mean the lands
and lots as subdivided at the time of the sale, the word " owner"
must be understood to refer to the *owner* at that time.   The act
of March 4, 1843, was not designed to limit the right of pre-emp-

tion to a different class of persons, but simply to abridge the time within which the improvements must have been made. If, as complainant insists, the right of pre-emption to lands and lots, as subdivided at the passage of the act of 1843, became absolutely fixed and vested by that act, it would follow that the right would also be fixed and vested in the *then* owner, and as the law makes no provision for its transfer, he alone could avail himself of its benefits. We have, however, given a different construction to the law, and are disposed to hold, that the owner of the improvements, at the time the lands are brought into market, has the right to make the purchase. Some other questions, of minor importance, were raised on the argument, which it is not deemed necessary to notice particularly.

The decree of the Cook County Court of Common Pleas will be set aside, and a decree entered in this Court, allowing the complainant to purchase at the appraisement, all of the lots included in blocks number fifty-seven, and fifty-eight, as the same have been laid off by said trustees, it appearing, from the record, that the improvements made by Scott, previous to December, 1842, extended upon some part of all of said lots ; but as it was complainant's own fault, that he did not make the purchase in September, 1848, and as the credit allowed upon sales made at that time, will expire on the first of September next ; the complainant will now be required to pay to said Trustees the full amount of the appraisement of said lots, on or before the first day of September, 1851, and upon the receipt of the money, the Trustees will be required to execute to the complainant, a conveyance for the same. In case of a failure to pay for said lots within the time limited, the complainant will be for ever afterwards, barred of his right of pre-emption to said lots.

As the record does not show the appellants to have been at all in fault, the appellee will be required to pay the costs both in this Court and the Court below.

*Decree reversed.*

CATON, J., dissenting. In stating my views of this case, it is only necessary that I should examine the single question, upon which I disagree with the conclusions at which a majority of the Court have arrived. This question involves the right of the Canal Trustees, by laying off the premises in controversy into town lots, to diminish the quantity of land to which the com-

plainant would otherwise be entitled. The rights of both parties are derived under, and depend upon, the canal law of February, 1843, and the acts supplemental thereto. Under these laws, the legal title to the canal and canal lands was conveyed to the trustees, in trust, for the purpose of raising money and completing the canal, and for the payment of certain debts due from the State, after which the remaining property is to revert to the State.

I maintain, first, that the Trustees are to be considered purchasers, of this land under the law of 1843, which is to be considered a contract between the State and the Trustees, representing the other *cestui que trusts*. The fact that the State has a residuary interest in the subject of the conveyance, and in the trust fund, in no wise changes the rights of the plaintiffs, or the title which they hold. They are to be treated precisely as if they had purchased the property absolutely, and are entitled to no greater immunities, than as if the State had parted with all of her equitable, as well as her legal title. None of the sovereign prerogatives, or special favors, which the State, as owner of the land, might claim, passed to the Trustees. As a remote *cestui que trust*, the State cannot assert her extraordinary and sovereign privileges, in this legal controversy with parties to whom she has transferred all of her legal, and part of her equitable title. When she mixes up her rights with others, she descends to their level, so far as those rights are concerned, and does not elevate them to hers. This has been repeatedly decided by the Supreme Court of the United States, in the cases of the United States *v.* The Planters' Bank, 9 Wheaton, 904; The Bank of the Commonwealth of Kentucky *v.* Wister, 2 Peters, 318, and Briscoe *v.* The Bank of the Commonwealth of Kentucky, 11 Peters, 324. The Court, in the last case, after referring to the former, says: "They show that when a State becomes a stockholder in a bank, it imparts none of its attributes of sovereignty to the institution, and that is equally the case, whether it own the whole or a part of the stock of the bank."

Unless expressly exempted by law, this property is subject to all the incidents and liabilities of private property. The Board of Trustees are liable to be sued like other corporations, and it will not be denied, that their corporate property is liable to be seized and sold for the payment of their debts. If this were not

so, the right to sue them would be a barren right, without any practical results or benefits. But for the express exemption by law, this property would be liable to taxation the same as private property. This has been substantially decided, by this Court, at the present term, in the case of the Canal Trustees v. The City of Chicago, where it was held that canal lots were liable to special assessments for opening streets. Had the State continued the owner of the land, it would not have been liable to such assessments, and the decision, as I understand it, is placed expressly upon the ground, that the Trustees are purchasers for a valuable consideration, and as such, their property is liable to public burthens, except where expressly exempted by law. In delivering the unanimous opinion of this Court, in that case, the Chief Justice says: "It is insisted that the canal lands, are to be regarded as the property of the State, and therefore exempted from the payment of the assessment. This proposition cannot be maintained. The State, for a valuable consideration, has granted these lands to the Board of Trustees." And again: "The State cannot now be regarded as the owner of the lands." In my judgment, this places the title of the Trustees in its true light, and I feel called upon to carry out this doctrine, to its legitimate extent, and to apply it, wherever it is, in my judgment, properly applicable.

This disposes of all of that part of the argument, which relied upon the continuing interest of the State in these lands, and of the sacred character of the fund to be raised from them. This is no more sacred, than it would be if it belonged to the State creditors, or the Trustees alone. For the present then, I may safely lay out of view all idea of State interest in these lands, and treat the Trustees as absolute *bona fide* purchasers, under the law of February, 1843. Under that act, the Trustees acquired their title, and they took it subject to all the liabilities imposed by that act. It enters into and forms a part of their contract of purchase, and they are bound to perform all its obligations, whether to the State or to others. One of those obligations is, that they shall sell to those persons who are entitled to pre-emptions under the proviso to the thirteenth section of the law, the lands and lots, on which their improvements are situated; and that obligation is to be construed the same as if they had, by a separate agreement, after they had received the title, and for a

valuable consideration, agreed with the pre-emptors, in person, to make such conveyance. That obligation was a part of the consideration of the conveyance, and its sufficiency they cannot be allowed to question. As parties to such a contract for a conveyance, I shall therefore hereafter consider them.

I will now examine, what right the pre-emptor has under the law.

The thirteenth section of that act, specifies many of the duties and obligations of the Trustees, and among other things, provides, that "the said lots, lands and water powers, shall then be offered for sale by said Trustees, at public auction, in lots and legal subdivisions, once or oftener in each year, for four succeeding years." And the section concludes with the following proviso: "*Provided,* that in all cases where improvements were made upon the said canal lands or lots, previous to the first day of February, eighteen hundred and forty-three, the owners of such improvements, shall be entitled to purchase the said lands or lots on which said improvements are situated, at an appraisement to be made as aforesaid, without reference to said improvements." In order to understand these provisions properly, we must remember, that before they were granted to the State by the general government, all the canal lands had been surveyed into legal subdivisions, according to the system of surveys of the United States lands, as it existed in 1819, and that previous to the passage of the law in question, many of those lands had been laid out into town lots by the old Board of Canal Commissioners. This explains the meaning of the words, "in lots and legal subdivisions," in the above clause, providing for the sale of the canal lands. In no other quantities or form, could the Trustees offer these lands for sale, either to persons entitled to pre-emptions or others, and it is understood, that so literal have been the Trustees in their construction of this provision, that parties entitled to pre-emptions, have been required to attend the public sales, and when the lands which they were entitled to purchase, were offered at public auction, then to bid the amount of the appraisement; and this was undoubtedly a very reasonable precaution.

This direction, as to the mode of sale, enables us to determine with unerring certainty, what was meant by the words "said lands or lots" as used in the proviso, as specifying what the pre-

emptor should have the right to purchase. Those words are manifestly used as descriptive of two classes of property. The word *lands* was intended to describe all that portion of the canal lands, which had not been subdivided into town lots, and by the word lots, was intended, town lots. This is too clear to be doubted, and I shall not stop to prove, what must strike every one as undeniable. This law provides that the owner of the improvement shall have the right to purchase the land on which his improvement is situated. The same section provides that the land shall be sold in legal subdivisions. The law, therefore, expressly inhibits the sale to him, of less than a legal subdivision, and as he has the right to purchase the land, there is no escaping the conclusion, that he has the right to purchase the legal subdivision on which his improvement is situated. This legal subdivision is such as is made by the government surveys. His right to this, is just as clear, as if the proviso had stated in express words, that the owners of improvements should have the right to purchase the legal subdivisions of lands not laid off into town lots, on which their improvements were situated. The language of the act is thus specific in relation to town property, for the word *lots* is as definite as tracts or legal subdivisions of lands. It means a specified area, defined by known boundaries, previously established, in a legal mode. No language could well have been used to have secured to the owner of the improvement, the right to purchase the entire lot on which he had made the improvements, whether they covered the entire lot or not, and are we to suppose, that the legislature intended to be less specific, less just, or less liberal to the settler upon farming lands, than to the inhabitants of the towns? The truth is, all were intended to be treated alike.

The course of the argument, now leads me to inquire into the nature of the provision made in favor of the settler, by this act.

That here was a grant of rights, to the owners of these improvements, cannot be denied, for the same legislature in another canal law, passed only eight days after, for the purpose of limiting the operation of the proviso, calls them "pre-emption rights *granted* by the provisions" of the former law. This right of pre-emption has been declared by this Court, in the case of Delaunay *v.* Burnet, 4 Gilman, 454, to be property, the subject of alienation, and liable to be sold on execution. And in the case

of Lytle *v.* The State of Arkansas, 9 Howard, 335, the Supreme Court of the United States distinctly declared, that the right of pre-emption was a vested right. That Court said: "By the grant ·to Arkansas, Congress could not have intended to impair vested rights. The grants of the thousand acres, and of the other tracts, must be so construed as not to interfere with the pre-emption of Clayes." Here there was a vested right of property granted to Scott and his assigns, as valid and efficacious, as if they had been mentioned by name in the grant, and it was as binding and meretorious, as if he had paid a consideration in money for it. That it was considered meretorious, is conclusively proved by the fact of the grant to him, and who is at liberty to deny or inquire into the sufficiency of the consideration money to the State, for a grant which she is authorized to make? Even the State herself, with all her sovereign power, is not at liberty to assume that a grant which she has made, was without consideration, and to resume, limit, or abridge it. These plaintiffs, as well as others, are interested in maintaining inviolate, this sacred principle of the fundamental law. If the State herself cannot do this, much less should the Court be asked to assume, that the grant was made upon an inadequate consideration, for the purpose of inducing us to limit or lean against it, when the State herself makes no complaint. All that the State granted, as to her, was passed and perfected. It required no further action on her part, to give it efficacy. As to her, the grant was executed. What remained to be done, to enable the grantee to enjoy the benefit of the grant, the trustees in effect covenanted with the State that they would do. I say covenanted with the State, for such was the nature of the obligation which they assumed, by accepting the transfer to them, under the provisions of this law. This obligation was a part of the consideration of the transfer to them, and they cannot question the consideration which they received for the undertaking. It was this agreement to convey to the owners of the improvements, the lands and lots on which their improvements were situated, which the State granted to them. Such was the nature of this grant. By it the pre-emptors became the obligees of the trustees, who assumed the obligation to sell to them the legal subdivisions, according to the government surveys, of lands, not laid off into town lots, upon which *their* improvements were situated, and

that they would sell to the owners of improvements upon town lots, the lots on which *their* improvements were placed.  I shall assume throughout, that I have shown, incontrovertibly, that this is the true construction of the words *lands* and *lots*, in the proviso.  I take it that this obligation is as binding upon the Trustees as if they had, with full authority of law, after they acquired the legal title, entered into a covenant for a full consideration paid, with the pre-emptors, to convey to them the tracts and lots on which their improvements are situated, specifically describing each.  Although in the undertaking which they did assume, neither the names of the persons to whom the conveyance was to be made, nor the lands to be conveyed, are specified, yet the means of ascertaining both are provided, and when thus ascertained, the obligation is precisely the same, as if they had been given.  The consideration is as sufficient, and the obligation as strong, in the case before us, as in the one supposed, and should be construed to secure the same right.  When the Trustees are called upon to execute their undertaking, and to make effectual the grant made by the State, upon what principle can their counsel contend, that the grant was made without sufficient consideration?  that it was a mere boon—a gratuity, without merit, and without claim to favor?  I have already shown that the pre-emptors have the merit of a legislative grant, and they are entitled to legal favor, which is nothing more, than the even handed justice of having the charter of their rights construed as favorably for them, as against them.  If they claim under a grant from the State, the plaintiffs hold all their rights by virtue of the same law, and there is as much reason for applying the the strict rule to the one as the other.  But I hold that it is applicable to neither, and that a just and reasonable construction should be given to the rights of both, such as is always applied in controversies between individuals.  Whether this grant was a mere boon, or made in pursuance of the most sacred obligation, is not for the party to urge, or for the Court to consider.  The rights of the parties before us should be construed, the same as if arising out of the same contract between individuals.  Suppose the legislature had sold these lands absolutely to the plaintiffs, who had then on their part entered into an agreement with one who had made improvements, both upon farming lands and town lots, that they would convey to him, the legal subdivisions

of land and the town lots upon which his improvements were situated. In the construction of such a contract, would any one contend, that they would have the right to subdivide the tracts of lands and lots, and then say to the purchaser, you shall not have the legal subdivision or town lot, as it existed at the time we made the contract, but you shall be content to take such portions as we choose to assign you, embracing your improvements? The bare suggestion of such a proposition, would be startling to all our notions of justice. It was not the improvements alone, or the lands covered by them, which was contracted for, but it was the tracts of lands and lots upon which they were situated, the entire tracts and lots. I cannot appreciate the propriety or the justice of thus allowing one party, to circumscribe or fritter away the rights of the other. To me it is an anomaly in the construction of obligations. It could never have been the intention of the legislature, to leave it to the plaintiffs to say, how much or how little, the purchaser should take under the right which was granted him, and which they were bound to execute. That would be in effect to make them the arbitrary and sole judges of their own liability, and a law which makes a man a judge in his own case, is abhorrent to the first principles f natural justice, and no approach to it, can ever be imputed to the legislature.

It was insisted at the bar, that the right of the trustees to reduce the quantity of land which they were bound to convey to the owners of improvements, might be inferred from the authority which they have to lay out into town lots, lands suitable therefor. By the canal law of 1836, the Canal Commissioners were authorized and required to lay off into town lots, all lands suitable for that purpose, and by the eighth section of the act of February, 1843, it is provided, that the Board of Trustees " so far as is not inconsistent with this act, shall possess all the powers and perform all the duties conferred upon the Board of Commissioners of the Illinois and Michigan Canal, by the act entitled ' An act for the construction of the Illinois and Michigan Canal,' approved January the ninth, eighteen hundred and thirty-six, and the acts supplementary and amendatory thereto." One of those powers and duties, undoubtedly was to lay off towns, but without that provision, they would have been authorized, under the general statute, to have done the same thing, and as faithful

trustees, it would have been their duty to have done so, when-
ever the interest of the trust fund required it. That statute con-
ferred no new authority, nor did it impose any new duty, and
its existence does not alter the case in any point of view. How
can it, if the law is the same without it as with it? And I shall
not stop to prove so plain a proposition, until it is denied. But
even admitting that they could only exercise the right of laying
off towns under this old statute, thus adopted, still the adopting
clause only authorizes its exercise, when that can be done con-
sistently with the provisions of the last act. Whenever its ex-
ercise, would in any way infringe upon or impair the rights
granted by this act, it would not be compatible with it; and
and then the exercise of such rights, is not only not conferred,
but is actually restrained. Whatever authority was conferred
upon the Trustees by the act, should not, if it can be avoided, be
construed as subversive of the rights granted to others. There
certainly could have been no rights conferred upon the Trustees
inconsistent with a plain duty imposed upon them. If we were
right when we decided that the Trustees are to be considered as
purchasers of this land for a valuable consideration, and I am
right in my conclusion, that their right to lay off town lots, is
the same and no more than that of other purchasers who hold in
trust, with authority to sell, then they are restrained from the
exercise of that right, whenever its exercise would diminish their
liabilities to others, or infringe upon the vested rights of third
parties, the same as other proprietors of land would be. Could
an individual, by the exercise of his general authority to subdi-
vide his lands, reduce the tract which he had agreed to sell, and
also his own liability to convey? Suppose I have improvements
upon surveyed lands and town lots, belonging to another, and
he agrees to convey to me the lands in legal subdivisions, and
the town lots, on which my improvements are situated, could
he subdivide the lands and lots, so as to diminish the tracts or
parcels to which I would otherwise be entitled? In an individ-
ual it would be considered a subterfuge, which would meet with
little countenance in a court of equity. He would, at once, be
required to convey the property in the legal subdivisions and
town lots, as they existed at the time the agreement was made.
My rights would be enforced as they existed at the time I ac-
quired them. Who would tell me, that at the time I made the

agreement, I knew that the law authorized him to subdivide the lands into town lots, and that I, therefore, took it subject to that right? If any did, I should answer with confidence, that by making the agreement, he had parted with that right.

One of the counsel, with the view of enforcing his argument, based upon the authority of the Trustees to subdivide, read the provision of the law of 1836, which conferred that authority upon the Canal Commissioners, in immediate connection with, and as if introduced into the proviso, which grants these pre-emption rights, but in doing so, he took, as I think, the unwarrantable liberty of introducing it in such a way as to make the right to the settler, subservient to the right of the trustees to subdivide. So far from this being authorized by the law of 1843, the reverse is required by the very terms of the eighth section, which revives, in the Trustees, the powers conferred on the old Commissioners. I think the counsel would have got much nearer the intention of the legislature, had he introduced the limitation clause contained in the eighth section of the law of 1843, in connection with both, so that all might have been understood together. If he had done so, the whole provision would have read thus: "*Provided*, that in all cases where improvements were made upon the said canal lands or lots, previous to the first day of February, eighteen hundred and forty-three, the owners of such improvements, shall be entitled to purchase the said lands or lots, on which said improvements are situated, at an appraisement to be made as aforesaid, without reference to said improvements;" and "so far as is not inconsistent with this act," the said Trustees "shall examine the whole canal route, and select such places thereon, as may be eligible for town sites, and cause the same to be laid off into town lots, and they shall cause the canal lands, in or near Chicago, suitable therefor, to be laid off into town lots." This transposition, as I conceive, gives the true meaning of the several provisions on the subject, and when so read, it is very clear to my mind, that there was no power conferred on the Trustees, to subdivide the lands, so as to limit the right conferred on the pre-emptor, as it existed at the time of the grant. When thus exercised, it would be inconsistent with the provisions of the act which made the grant.

Let us view this right granted in another light. Suppose that in consideration of money paid into the state treasury, or the

surrender of canal bonds at the time the act was passed, this proviso had required the Trustees to convey to the owners of the improvements, the legal subdivisions of lands or town lots on which their improvements were situated, without any further compensation; would the Trustees have had the right to diminish the extent of the claim, by a subdivision of the lands? The fact that a further consideration is to be paid to the Trustees, in nowise changes the character of the right granted by the state, or the liability imposed upon the Trustees. Indeed, the argument, that by subdividing the land, and thus diminishing the extent of the claim, they might increase the trust fund, if a just one, would be more forcible then than now: for then, there would be a real saving; while now, the pre-emptor pays the full value of every foot of land which he gets. But in my judgment, the argument itself is illegitimate. Here was a right granted, into the consideration of which we have no right to inquire; and it was as fixed and determinate as if the act had granted to Scott, by name, and his assigns, the tract or legal subdivision of land on which his improvements were situate; and when ascertained, required the Governor or Trustees to make him a conveyance therefor. It was never intended by the legislature, that these rights should be subject to the control of the Trustees; any more than that the rights of the Trustees should be subject to the control of the pre-emptors. To the Trustees they granted certain rights, which we should never allow to be invaded; and to the settlers, whether they were considered as objects of bounty or of justice, they granted certain other rights, which should be equally protected.

If it is determined that the Trustees have the right to subdivide the lands, and make the pre-emptors take up with a part, then they must have the same right to cut up the town lots. But this can never be. It is the lots upon which the improvements were situated, and not other lots, the right to purchase which was granted, subsequently to be carved out. It seems to me, that the Trustees have obligated themselves to convey the lots as they were then situated, in as plain terms, as if each lot had been described by its number or boundary. That is certain which can be rendered certain. It was not even contended on the argument, that there was any more authority for subdividing one description of property than the other. I see no way of es-

caping the conclusion, that the decision in this case will determine that *the* lot does not mean the lot upon which the improvement was then situated, but another lot which the Trustees might subsequently lay off, embracing the improvement. If so, the word *the* was applied to a very indefinite subject.

But admitting all that was said on the argument, going to show that the great object of the legislature was to secure to the occupant the improvement which he had made, and not to allow him to speculate out of the canal fund, and still it does not prove that it was their design to confine him to the ground actually covered by his improvement. The grant is of the right to purchase the lands and lots *on* which their improvements are situated, and not that portion covered by their improvements. The idea that they should be confined to the latter, is not only rebutted by the express words of the act, but also by the fact that they are required to pay the full value of the land, exclusive of the improvement. If the purchaser pays the full value of all the land he gets, then the trust fund is not injured by his being allowed to purchase the entire lot or subdivision. While it would be a convenience to the settler, to allow him to get sufficient land to make a suitable plantation, it would be no detriment to the trust fund. It would be accomplishing the policy of the law, which is to dispose of the lands at their full value, as soon as possible; to have them improved, and add to the general wealth of the state; to make them subject to taxation, and increase her revenues. And it was never the intention of the law, that the Trustees should turn speculators, and withhold the lands from sale, in the hope of an uncertain advance. Every precaution was taken, that the lands should not be sold for less than their real value; and in this whole record, there is not an intimation that the land in controversy was not appraised at its full value; but all the evidence shows the reverse. The controversy seems to be, who shall have the benefit of the appreciation since? It is a new doctrine, if this belongs to the seller after he is bound to convey.

It is well known, that the settlers in a new country first make small improvements, increasing them as their means and time enable them; and it takes many years before they reduce to cultivation all that they design, or all that is convenient for a farm. To deprive them of the means of extending their improvements

beyond their first garden, would be to deprive them of all the real value of their first improvements. The legislature well knew this, and acted in view of it. These rights were granted in 1843; and it was known that the lands would not be brought into market for some years, during which time it must have been foreseen that the settlers, both in town and country, would desire to extend their improvements; and it was manifestly the design of the legislature, to enable them to know how much they would be entitled to purchase, that they might improve accordingly. And now, shall we establish a rule which will enable the Trustees to deprive them of all the improvements made since the passage of the law? If the right claimed for the Trustees be legal, then they may, as was done in this very case, run streets and alleys through a man's enclosed field, which existed at the time of the passage of the law, and thus destroy his improvement for the very purpose for which he desires it. In this very case, the Trustees have donated to the city of Chicago, as streets, the very land, confessedly, which they were bound by the law and their contract to convey to the pre-emptor. Is not this a violation of their express contract, and an outrage upon the vested rights of Scott and his assigns? He is not allowed to take the whole, even of his original improvement, in existence at the time of the passage of the law; for a part has been conveyed in fee to the city, while, in order to get the remnant, he is obliged to pay the Trustees for the part of which he is thus deprived; for the evidence shows, that that was included in the appraisement which he has to pay to get the pittance allowed him. Surely this was a new kind of vested rights, which Scott acquired. If such is the true construction of the law and the contract, then indeed they "hold the word of promise to the ear, but break it to the hope."

The decision which is made supercedes the necessity of determining what constitutes a legal subdivision. As I agree with the majority of the Court, as to who are entitled to pre-emptions, that the rights are assignable, and in fact, I believe, all of the questions determined except this one, further allusion to them is unnecessary, although I have arrived at those conclusions for different reasons in some respects. This expression of opinion on the great question examined, will be deemed sufficient, without reiterating my dissent in other cases involving the same

35

question; and my silent acquiescence will not indicate a change in my convictions. Should such change take place, I shall embrace the earliest opportunity to testify my reformation.

I dissent from the decree which is rendered.